UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WEST,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>    Defendants. | Case No.  21-cv-02370-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>Docket Nos. 37-38, 50 |

## I.   INTRODUCTION

James West ("Plaintiff") brings several causes of action against three defendant entities: Episcopal Community Services ("ECS"), the City and County of San Francisco (the "City"), and Dolores Street Community Services ("DSCS") (collectively, "Defendants").  Plaintiff also brings suit against the following individuals:  from ECS, Kathy Treggiari (director of program), Jarrell Brown (HR manager), and Emeka Nnebe (site manager); and from DSCS, Saul Hidalgo (deputy director) and Steven Reus (operations manager).  ECS operates two homeless shelters:  Sanctuary and Next Door.  DSCS operates a homeless shelter at Jazzie's place, which services primarily lesbian, gay, bisexual, and transgender homeless adults.

Plaintiff brings federal claims under (1) the Fair Housing Act; (2) Title I of the Housing and Community Development Act of 1974; and (3) Title VI of the Civil Rights Act of 1964. Docket No. 34 ("FAC").  Additionally, Plaintiff brings several state law claims under the California Fair Employment and Housing Act, negligence claims, retaliation claims, and a breach of mandatory duty claim.  *Id.*  Pending before this Court are the Defendants' three separate motions to dismiss the FAC.  *See* Docket No. 37 ("City Mot."); Docket No. 38 ("ECS Mot.");

1   Docket No. 50 ("DSCS Mot.").  For the reasons below, the Court **DENIES** ECS's motion to

2   dismiss Plaintiff's hostile environment claims under the FHA, CA FEHA, and Title VI.  The Court

3   **GRANTS** Defendants' motions to dismiss all remaining claims.  The Court dismisses the

4   following claims **with leave to amend**: the FHA reasonable accommodation claim against ECS,

5   the FHA, CA FEHA and Title VI claims against DSCS, the negligence claims against all

6   Defendants, the retaliation claims against ECS and DSCS, and the breach of mandatory claim

7   against the City.  The Court dismisses the following claims **with prejudice:** the Title I claim

8   against all Defendants, the FHA, CA FEHA and Title VI claim against the City, and the Title VI

9   claim against individual defendants.

## II.     RELEVANT BACKGROUND

A.     Factual Background

12      Plaintiff is a disabled homeless Afro-American non-gender conforming individual residing

13   in San Francisco.  FAC ¶ 1.  The following are the relevant facts as to each Defendant.

1.     ECS

15      On or about February 7, 2019, Plaintiff obtained a 90-day bed reservation at Sanctuary, a

16   homeless shelter operated and managed by ECS.  FAC ¶ 31.  Plaintiff alleges that he submitted

17   and was granted a request for reasonable accommodation to allow him to return to the shelter daily

18   by 10 p.m. due to a mental and physical health program.  *Id.* ¶ 32.  He was assigned a single bed in

19   the men's section at the Sanctuary shelter.  *Id.* ¶ 33.  He observed that shelter staff who monitored

20   the sleeping sections rarely wore their name tags.  *Id.* ¶ 43.  After a few days at the shelter, he

21   observed mice running around the men's shelter sleeping section, leaving droppings, and crawling

22   in and out of the resident's shelter drawers.  *Id.* ¶ 34.  He was concerned that the mice would

23   spread diseases and he submitted a complaint form.  *Id.* ¶ 35.  He allegedly contacted the City's

24   Building Inspection Department on February 11, 2019, to complain about the mice.  *Id.* ¶ 35.  He

25   observed other shelter residents try to remove the mice themselves by placing sticky pads and

26   disposing of the trapped mice in the mornings.  *Id.* ¶ 37.  Shelter residents also allegedly mopped

27   the floors every morning to remove the mice droppings and they complained that the mice were

28   bleeding in their night storage bed drawers.  *Id.*  He claims that he never heard from the City's

United States District Court
Northern District of California

Building Inspection Department about his complaint.  *Id.*

Two weeks into his residency at Sanctuary, he became disturbed by the increasingly offensive language male residents used towards women.  *Id.* ¶¶ 38–39.  He claims that the male residents were not given warnings or told that such speech was not allowed.  *Id.* ¶ 39.  He also claims that male residents frequently made homophobic and racist comments and that he was subjected to such comments daily.  *Id.* ¶ 39.  Plaintiff alleges that despite several efforts to meet with the site manager to discuss his experiences, he was unable to obtain a meeting.  *Id.* ¶ 40.  He also claims that he made several inquiries about transferring to the disabled men's section but was informed no beds were available.  *Id.* ¶ 41.  But when he spoke with several disabled shelter residents, they informed him that there were several empty beds in the disabled men's shelter.  *Id.* ¶ 42.

On March 29, 2019, Plaintiff wrote an email to the ECS Program Director Kathy Treggiari about being refused a meeting with the shelter site manager and his concerns about the "repeated use of racial, sexual, and homophobia [sic] language by staff and clients; repeated instances of stalking . . . and repeated occurrences of unwanted advances by clients." *Id.* ¶ 44.  Treggiari responded and copied Associate Director of Shelters Jarrell Brown and Emeka Nnebe to set up a meeting about Plaintiff's concerns.  *Id.* ¶ 45.  Plaintiff allegedly never met with Jarrell Brown, the Human Resources manager, or Emeka Nnebe, the site manager.  *Id.* ¶ 53.

He also alleges that on the morning of March 31, 2019, another unidentified shelter resident "repeatedly began to shake and pull on Plaintiff while he layed in [sic] in his homeless bed." *Id.* ¶ 46.  The shelter resident allegedly used racial slurs against Plaintiff and threatened to inflict physical violence.  *Id.*  Then, the resident followed Plaintiff to the floor monitor desk, where Plaintiff sought assistance.  *Id.*  Shelter staff allegedly appeared to be under the influence, did not address the use of racial slurs and threats, and handed Plaintiff a complaint form.  *Id.*  Plaintiff claims that after two repeated threats of physical violence, he exited the sleeping quarters to use the phone.  *Id.*  He called 911 because the unidentified resident and another resident followed him and repeatedly tried to engage in a physical altercation.  *Id.*  Two San Francisco Police Department ("SFPD") Officers responded to the scene and conducted interviews of the

3

parties. *Id.* ¶ 47. Plaintiff claims that instead of making a citizen's arrest, the officers obtained a commitment that the assaulting party stay away from Plaintiff and never touch him again. *Id.* ¶ 48. Plaintiff agreed with this arrangement. *Id.* ¶ 49. The SFPD officers met with on-duty shelter staff and informed them of the altercation. *Id.* ¶ 50. Shelter staff allegedly informed the police officers that Plaintiff could make a formal complaint and that an investigation would be made. *Id.* Plaintiff alleges that shelter staff provided him a complaint form, but that staff refused to accept his written complaint. *Id.*

Then, from April 1 to April 6, 2019, Plaintiff was allegedly stalked and repeatedly threatened with physical assault. *Id.* ¶ 51. He claims that individuals "would wait for the Plaintiff to enter the building and wait for Plaintiff in [a] dark stairwell leading to the men's sleep section . . . and would block the path up the stairs [and] threaten Plaintiff with assaults." FAC ¶ 51. Plaintiff states he reported these incidents to front desk staff but was informed that they "don't provide private security services" and to call the police instead. *Id.* ¶ 52. On or around April 8, 2019, Plaintiff left the Sanctuary shelter after he was threatened with having his throat cut. *Id.* ¶¶ 55–56.

### 2. DSCS

In July 2019, Plaintiff obtained shelter at Jazzie's Place, a shelter managed and operated by DSCS. *Id.* ¶ 67. On or about July 9, 2019, Plaintiff requested a reasonable accommodation to arrive one hour after the 10 p.m. curfew. *Id.* ¶ 67. Plaintiff alleges that during his stay at Jazzie's Place, he experienced harassment from other shelter residents. *Id.* ¶ 68. Plaintiff states that he complained to DSCS's Operations Manager Steven Reus of "annoying behavior" such as an "individual staring at him," "following him to the men's room" and "making strange heavy breathing sounds," and requested a transfer but did not receive one. *Id.* ¶ 69.

Plaintiff was also concerned about unjust treatment at shelter grievance hearings—in particular, that Hearing Officer Morena treated Latina shelter residents more favorably, and that Morena allowed Reus, whom Plaintiff alleges to be biased and prejudiced against Plaintiff, to participate in the hearing. *Id.* ¶ 70. Plaintiff claims that he filed a complaint with the San Francisco Human Rights Commission and that Commissioner Oyama wrote a letter of concern to DSCS's Deputy Director Saul Hidalgo when Hidalgo failed to respond to Plaintiff's emails. *Id.* ¶

United States District Court
Northern District of California

71.  Plaintiff also contacted Perdue regarding the harassment and discrimination he was experiencing.  *Id.* ¶ 72.  He alleges that after he had contacted the San Francisco Human Rights Commission he was "threatened with being smothered in his sleep."  *Id.* ¶ 73.

### 3.  The City

Plaintiff holds the City liable for the actions of the City's independent contractors.  *Id.* ¶ 27.  Plaintiff also alleges that he contacted San Francisco Adult Shelter Program Manager, Cathy Perdue, regarding the harassing treatment and discriminatory conduct.  *Id.* ¶ 73.

### 4.  Glide Foundation

On or about January 23, 2020, Plaintiff allegedly contacted the San Francisco Human Rights Commission regarding his treatment during Glide's free meals service.  *Id.* ¶ 58.  During the service, he allegedly informed Commissioner Navneet Bajwa at the SF Human Rights Commission of his upper respiratory condition that is aggravated by cigarette smoke and that the Glide staff did nothing to stop others from smoking in the service line.  *Id.* ¶ 59.  He had allegedly requested an accommodation for his condition, *e.g.*, an alternative to waiting in the service line but his request was denied.  *Id.* ¶ 60.  He then allegedly told Bajwa that he was being deliberately targeted and harassed with smoke by other clients and staff due to his prior complaints about smoking and misconduct by Glide staff.  *Id.* ¶ 61.  Bajwa allegedly agreed to write a letter of concern to Glide's CEO, Karen Hanrahan to discuss the matter before an investigation was conducted.  *Id.* ¶ 62.  Plaintiff was not informed of any discussions between Bajwa and Hanrahan.  *Id.* ¶ 63.

## B.  Procedural Background

On March 31, 2021, Plaintiff filed his original complaint against the City and ECS.  Docket No. 1 ("Compl.").  The City and ECS filed motions to dismiss.  Docket Nos. 9, 29.  In response, on August 3, 2021, Plaintiff filed a First Amended Complaint ("FAC") against twelve defendants—the City and ECS as well as new defendants DSCS, Glide Foundation, and eight individuals.  *See* FAC.  The Court dismissed the claims against three defendants: Karen Hanrahan of the Glide Foundation, Yesenia Lacayo of DSCS, and Cathy Perdue from the City.  Docket No. 42.  The Glide Foundation failed to respond to the FAC, and the clerk entered a notice of default

United States District Court
Northern District of California

against Glide Foundation.  Docket No. 61.

The City, ECS, and DSCS each filed a motion to dismiss the FAC.[1]  *See* Docket Nos. 37, 38, 50.  Individuals Treggiari, Brown, and Nnebe joined ECS's motion to dismiss the FAC.  *See* Docket Nos. 46, 47.  Hidalgo and Reus filed the motion to dismiss with ECS.  *See* ECS Mot. Plaintiff opposes all three motions. *See* Docket Nos. 66 ("ECS" Opp."), 67 ("DSCS Opp."), 70 ("City Opp.").

## III.    APPLICABLE LEGAL STANDARDS

A.    Rule 8 and Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

---

[1] DSCS also filed a request for judicial notice of the San Francisco Department of Homelessness and Supportive Housing's website explaining the department and its mission, the City and County of San Francisco Human Services Agency Grant Agreement with Dolores Street Community Center, and the San Francisco Shelter Grievance Policy applicable to Dolores Street Community Center. Docket No. 51.  Plaintiff opposes because the documents are allegedly unauthentic, prejudicial, and irrelevant.  Docket No. 52.  Because these documents are unnecessary to resolve Defendants' motions to dismiss, the Court denies DSCS's request for judicial notice at this time. *See* Fed. R. Evid. 201(b).  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1000 n.5 (9th Cir. 2018) (courts do not take judicial notice of irrelevant facts).

United States District Court
Northern District of California

content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). If the court dismisses pleadings, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Where a plaintiff is proceeding pro se, the Court has an obligation to construe the pleadings liberally and to afford the plaintiff the benefit of any doubt. *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc). However, pro se pleadings must still allege facts sufficient to allow a reviewing court to determine whether a claim has been stated. *Ivey v. Bd. Of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

B.     Rule 12(e)

Under Rule 12(e), a court may order a more definite statement if "a pleading . . . is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). While motions for a more definite statement "are viewed with disfavor" because of the "minimal pleading requirements of the Federal Rules," a court should grant such a motion where "the complaint is so general that ambiguity arises in determining the nature of the claim or the parties against whom it is being made." *Sagan v. Apple Computer, Inc.*, 874 F.Supp. 1072, 1077 (C.D.Cal.1994); *see also McHenry v. Renne*, 84 F.3d 1172, 1179–80 (9th Cir.1996) (motion for more definite statement is appropriate where complaint is "prolix" and "confusing").

IV.     **DISCUSSION**

A.     Federal Claims

Defendants assert that Plaintiff fails to state a federal claim against any Defendant. As a preliminary matter, some of the Defendants argue that Plaintiff's opposition is untimely as it was filed on March 15, 2022, instead of March 11, 2022, as ordered by the Court, Docket No. 65. Docket No. 73 ("City Reply") at 2; Docket No. 71 ("ESC Reply") at 1. Because Plaintiff appears

United States District Court
Northern District of California

pro se, the Court in its discretion rejects Defendants' arguments and considers Plaintiff's opposition.[2]  *See S. California Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir.), *modified*, 307 F.3d 943 (9th Cir. 2002) ("District courts have 'inherent power' to control their dockets.").

### 1.   Fair Housing Act

The parties dispute whether Plaintiff has a valid claim under the Fair Housing Act ("FHA").  The Fair Housing Act prohibits discrimination in the sale or rental of a dwelling, or in the provision of related services or facilities, based upon someone's "race, color, religion, sex, familial status, or national origin."  *See* 42 U.S.C. §§ 3603–04.  Specifically, section 3604(d) makes it unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  42 U.S.C. § 3604(d).  Courts "apply Title VII discrimination analysis in examining [FHA] discrimination claims."  *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997).  "Thus, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment, or disparate impact."  *Id.* at 304–05 (citation omitted).  "Additionally, a plaintiff may sue under section 3604(f)(3)(B) of the Fair Housing Act Amendments ("FHAA") if a local municipality refuses to make reasonable accommodations for handicapped housing."  *Id.* at 305.

To state a prima facie claim of disparate treatment, Plaintiff must plausibly plead (1) that he is a member of a protected class, (2) that he applied for and was qualified for shelter, (3) that he was rejected, and (4) that openings at the shelter remained available.  *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007).  To state a claim of disparate impact, Plaintiff must plausibly plead "at least that the defendant's actions had a discriminatory effect."  *Gamble*, 104 F.3d at 306.  The following are elements of an FHA prima facie case under a disparate impact theory: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially

---

[2] The City also argues that Plaintiff has effectively abandoned his claims for failure to respond to its arguments in his opposition.  Docket No. 73 ("City Reply") at 2.  For the same reasons, the Court does not find that Plaintiff has abandoned his claims.

United States District Court
Northern District of California

neutral acts or practices." *Id.*  And to plead a claim of discrimination based on failure to provide a reasonable accommodation, Plaintiff must plausibly plead that (1) he suffers from a handicap as defined by the FHA; (2) Defendants knew or reasonably should have known of Plaintiff's handicap; (3) "accommodation of the handicap 'may be necessary' to afford [Plaintiff] an equal opportunity to use and enjoy the dwelling"; and (4) "defendants refused to make such accommodation."  *United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997).

As a preliminary matter, Defendants assert that Plaintiff's FHA claim fails because he does not allege that DSCS and ECS's shelters are "dwellings" under the FHA.  The FHA defines a "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C.A. § 3602(b).  But the FHA does not define "residence."  As a result, "[w]hether a homeless shelter is a 'dwelling' subject to the FHA has divided courts across the country."  *Mcgee v. Poverello House*, 2021 WL 3602157, at *16 (E.D. Cal. Aug. 13, 2021).  The Ninth Circuit has "never squarely addressed the issue of whether all temporary shelters fit within the Act's definition of 'dwelling.'"  *Cmty. House, Inc.*, 490 F.3d at 1048 n.2.  But the Ninth Circuit in *Community House* noted that it had "little trouble concluding that at least part of the" shelter was a "dwelling" because it generated "up to $125,000 in rent per year from transitional housing units in which the tenants reside for up to a year and a half."  *Id.*

Some courts have concluded that temporary homeless shelters are not "dwellings" under the FHA.  ECS relies on *Intermountain Fair Housing Council*, and incorrectly argues that it is a binding Ninth Circuit decision that concluded that an analogous non-profit operated shelter was not a "dwelling" under the FHA.  Docket No. 71 ("ECS Reply") at 2 (citing *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 717 F.Supp.2d 1101 (D. Idaho 2010), *aff'd on other grounds*, 657 F.3d 988 (9th Cir. 2011)).  However, the Ninth Circuit in its review of the district court's decision in *Intermountain*, did not consider the issue of whether the non-profit homeless shelter constituted a dwelling under the FHA.  *See Intermountain,* 657 F.3d at 995

United States District Court
Northern District of California

(noting that it did not need to decide the statutory interpretation question under the FHA because the FHA's religious exemption allows religious organizations to limit access to their charitable services to people who practice the same religion). In the district court opinion, the *Intermountain* court relied on two out-of-circuit cases that held that the homeless shelters at issue in those cases were not "dwellings" under the FHA because "the individuals who stayed at the shelter had no other place to 'return to' or reside, *Woods v. Foster*, 884 F.Supp. 1169, 1173–74 (N.D.Ill.1995), or because the FHA "protects only 'buyers' and 'renters' from unlawful discrimination" and the plaintiffs were neither, *Johnson v. Dixon*, 786 F.Supp. 1, 4 (D.D.C.1991). *See Intermountain*, 717 F.Supp.2d at 1110–11. The district court thus concluded that a homeless shelter was not a dwelling for the purposes of the FHA because the shelter at issue did not charge a fee, guests were assigned a bed in a dormitory-style room, guests were allowed to stay for a maximum of 17 consecutive nights and were not allowed to stay at the shelter during the day, guests were not allowed to leave the shelter once they arrived in the evening, and guests were not allowed to personalize their bed area. *Id.* at 1111. The Ninth Circuit expressly declined to address this ruling by the district court. *Id.* at 995. In any event, there are distinguishing factors in this case. Here, the defendants do not contend that there was a limit on how long guests could stay nor that guests were not allowed to stay at the shelter during the daytime. Nothing indicates that shelter residents were prohibited from personalizing their bed areas either.

In any event, other courts have concluded that a homeless shelter is a "dwelling" under the FHA, based on a court's conclusion that the dictionary definition of "residence" is "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit[.]" *United States v. Hughes Memorial Home*, 396 F. Supp 544, 549 (W.D. Va. 1975); *see also Hunter on behalf of A.H. v. D.C.*, 64 F. Supp. 3d 158, 174 (D.D.C. 2014) (relying on *Hughes* and collecting cases). The court in *Hughes* recognized that the institution was "far more than a place of temporary sojourn to the children who live there." 396 F. Supp at 549. It reasoned that the residential center for dependent, neglected, or needy children was a dwelling because the children went outside for school but lived at the residential facilities. *Id.* The shelters here seem to be like those in *Hughes* because they are more

10

1    than a "place of temporary sojourn or transient visit" and they provide a residential facility to

2    people in need.

3          The Court finds these cases persuasive.  Therefore, the shelters at issue in this case can

4    constitute "dwellings" under the FHA and that Plaintiff fails to so expressly allege so alone does

5    not make his claim implausible.[3]

6                 a.   <u>City</u>

7          The City asserts that Plaintiff's allegations are insufficient to state a claim for race-based or

8    sex-based discrimination under the FHA because (1) it is unclear whether Plaintiff alleges

9    violations under disparate treatment or disparate impact; and (2) more significantly, the FAC fails

10    to allege facts showing that the City is liable under either theory.  City Mot. at 12.  For the City to

11    be liable under the FHA, it must have the authority to make housing unavailable to Plaintiff.  *See*

12    *Tuggles v. City of Antioch*, No. 08-CV-01914-JCS, 2009 WL 10668169, at \*18 (N.D. Cal. Oct. 2,

13    2009), *aff'd*, 472 F. App'x 786 (9th Cir. 2012) (granting defendants' motion for summary

14    adjudication on claims relating to FHA claim because "Plaintiff [had] produced no evidence that

15    Defendants [the city of Antioch, the city's police department, and independent police officers]

16    provided housing or housing-related services, nor has she provided evidence that Defendants had

17    the authority to make housing unavailable to her or anyone else").  "It is axiomatic that for an

18    official to make a dwelling unavailable, that official must first have the authority and power to do

19    so.  In other words, the official must be in a position to directly effectuate the alleged

20    discrimination."  *Meadowbriar Home for Child., Inc. v. Gunn,* 81 F.3d 521, 531 (5th Cir. 1996).

21          Here, Plaintiff generally alleges that the City "made unavailable or denied dwellings to the

22    Plaintiff because his race and because he engaged in protected activity."  FAC ¶ 76.  He further

23    alleges that the City "discriminated against Plaintiff in terms and conditions or privileges of

24    shelter services because of race and sex."  *Id.* ¶ 77.  But Plaintiff does not allege that the City

25    owns, operates, or runs the shelters in which the alleged violations occurred.  Rather, he seems to

26

27

28

[3] Plaintiff contends in his opposition that ECS's Sanctuary Shelter is a "dwelling" as defined by the FHA because "the shelter is a structure designed and intended for occupancy as a residence for homeless persons."  ECS Opp. at 7.  But he does not allege this in his FAC.

United States District Court<br>Northern District of California

claim that the City is liable because it receives federal funding to grant to independent contractors to provide homeless shelter and services. City Opp. at 2. However, Plaintiff has not alleged that the City has the authority directly to affect his housing situation.

For the first time in his opposition, Plaintiff contends that the City violated the FHA because it "failed to take steps to ensure compliance of its subrecipients not to discriminate" and that "this failure represents a de facto municipal policy and is a widespread custom or practice amongs[t] the City of San Francisco and its homeless shelters. City Opp. at 4 (*citing United States v. Maricopa Cty., Ariz.*, 915 F. Supp. 2d 1073 (D. Ariz. 2012)). As a result, Plaintiff argues that he has been denied homeless shelter services based on race, sex, and disability. *Id.* Plaintiff cites no case in which the FHA has been interpreted to impose a duty of supervision of a subrecipient of a grant as Plaintiff asserts herein. The *Maricopa County* case he cites instead involves municipal liability for a *constitutional violation* under Section 1983 pursuant to *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691 (1978). Even if *Monell* were to be applied under the FHA, that claim would fail here.

Under *Monell*, a municipality cannot be held liable under § 1983 for constitutional injuries inflicted by its employees on a theory of respondeat superior. *Monell*, 436 U.S. at 691. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. To establish liability for governmental entities under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal citations omitted).

A plaintiff can establish municipal §1983 liability in one of three ways: (1) a plaintiff "may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) a plaintiff can show that the wrongdoer "was an

United States District Court
Northern District of California

official with final-policymaking authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) a plaintiff can show that an "official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (internal citations and quotation marks omitted).

In this case, because Plaintiff has not alleged that the City or any of its employees engaged in unconstitutional discriminatory conduct, Plaintiff cannot prevail on a *Monell* claim based on the existence of unconstitutional acts of its contractors/grantees. City Reply at 4. And because Plaintiff has not plausibly alleged that the City had a municipal policy of discrimination based on race, sex, or disability, Plaintiff cannot prevail on a *Monell* claim based on the existence of an unconstitutional custom or practice. *Id.* at 4–5. *See e.g.*, *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *see also Tuggles*, 2009 WL 10668169, at *20 (finding that "Plaintiff's § 1983 claim must fail because Plaintiff has failed to present evidence that could support a finding of a custom, practice or policy of the city of Antioch that has caused a violation of Plaintiff's constitutional rights."); *cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 485 (1986) (holding that a municipal policy existed where "[p]ursuant to standard office procedure, the Sheriff's Office referred [the] matter to the Prosecutor and then followed his instructions.").

At this time Plaintiff's FHA claim against the City fails. The Court **GRANTS** the City's motion to dismiss Plaintiff's FHA claim **without leave to amend.**

b.   DSCS

DSCS also moves to dismiss Plaintiff's FHA claim because (1) he does not allege any facts showing that the DSCS or ECS discriminated against him based on his race, color, religion, sex, familial status, or national origin in the sale or rental of property; and (2) Plaintiff does not allege that the shelter qualified as a "dwelling" under the FHA. DSCS Mot. at 7. Plaintiff does not allege that DSCS discriminated against him in denying him housing based on one of the listed

United States District Court
Northern District of California

characteristics under the FHA.  Plaintiff does not plead the elements for discriminatory intent, discriminatory impact, or failure to provide reasonable accommodation under the FHA.  Perhaps if Plaintiff can show that DSCS refused to accommodate Plaintiff because of his disabilities—*e.g.*, DSCS refused to move him to the requested accommodation, disabled housing section, because Plaintiff is a non-gender conforming Afro-American, then he may be afforded protection under the FHA.  Although he alleges he experienced harassment from other shelter residents at Jazzie's, he does not allege that harassment was based on a protected category under the ADA, or that DSCS engaged in conduct that would give rise to its liability for the conduct of other residents.

Moreover, Plaintiff alleges that after he requested a transfer from DSCS's operations manager, Reus due to another resident who had engaged in "annoying behavior"—including "staring at him, following him into the men's room and making strange heavy breathing sounds" when Plaintiff changed his clothes—he did not receive one.  FAC ¶ 69.  Although he alleges that during the shelter grievance hearing,[4] Reus was "biased and prejudiced" against him, he does not allege that he was denied a transfer because of his race or sex.  *See id.*  He alleges that Officer Morena "treated a Latina shelter resident more favorably when she would not stay longer for his hearing" during which he expressed his concerns about the unjust treatment he was receiving.  *Id.* ¶ 70.  But Officer Morena is not named as a defendant in this action, and he does not allege with particularity how Morena treated Plaintiff less favorably than the Latina shelter resident or how such treatment affected his housing.  Accordingly, the Court **GRANTS** DSCS's motion to dismiss Plaintiff's FHA claim **with leave to amend**.

        c.    <u>ECS</u>

Similarly, ECS moves to dismiss Plaintiff's claim on the basis that (1) Plaintiff does not allege any facts showing that ECS discriminated against him in the sale or rental of a property based on his race, disability, or otherwise; and (2) even if Plaintiff had alleged that the shelter qualifies as a dwelling, his assertion is that other residents, not ECS or its employees, discriminated against him.  ECS Mot. at 6.

---

[4] Plaintiff does not explain what the shelter grievance hearing was for or any additional context.

Plaintiff correctly points out that under the FHA, it is unlawful not only to make a rental or a sale but to "otherwise make unavailable or deny a dwelling to any person because of race or sex." *See* 42 U.S.C. § 3604(a). The Ninth Circuit has suggested that the FHA does recognize a hostile environment type of claim as the FHA is "guided by interpretations of Title VII of the Civil Rights Act of 1964." *Hall v. Meadowood Ltd. P'ship*, 7 F. App'x 687, 689 (9th Cir. 2001); *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) (applying Title VII discrimination analysis to FHA claim); *Hicks v. Makaha Valley Plantation Homeowners Ass'n*, No. CIV. 14-00254 HG-BMK, 2015 WL 4041531, at *11 (D. Haw. June 30, 2015) ("The Ninth Circuit Court of Appeals has not yet addressed the issue of whether a hostile housing environment claim is actionable under the Fair Housing Act against a housing association or management company for the discriminatory conduct of one tenant against another. Other Circuit Courts of Appeal and lower courts in this Circuit, however, have recognized hostile housing environment claims where a plaintiff can establish that she was subjected to harassment that was sufficiently severe or pervasive so as to interfere with or deprive the plaintiff of her right to use or enjoy her home and where the management company knew or should have known of the harassment but failed to take appropriate action."); 24 C.F.R. § 100.600(a)(2) ("Hostile environment harassment refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith").

To state a hostile housing environment claim a plaintiff must allege that he was subjected to (1) unwelcomed (2) harassment that was (3) sufficiently severe or pervasive so as to interfere with or deprive the plaintiff of her right to use or enjoy [their] home." *See Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1290 (E.D. Cal. 2013) (citing *Quigley v. Winter*, 598 F.3d 938, 946-47 (8th Cir. 2010)). Courts determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening, or humiliating or a mere offensive utterance; and whether it unreasonably interferes with a tenant's living conditions. *Hall*, 7 F.App'x at 689; 24 C.F.R. § 100.600(a)(2)(i). Occasional or isolated incidents are not actionable; rather, a plaintiff

must show a concerted pattern of harassment of a repeated, routine, or generalized nature. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Moreover, under Title VII, "employers are liable for harassing conduct by non-employees 'where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.'"  *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (quoting *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997)).  The Ninth Circuit has stated that "this theory of liability is grounded not in the harassing act itself. . . but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action."  *Id.* (citing *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005)).  The same principles of "ratification or acquiescence" apply to ECS in the context of Plaintiff's hostile housing environment claim based on the conduct of other residents in the shelter.

Plaintiff alleges that throughout his stay at the ECS shelter, other residents made homophobic, sexist, and racial slurs on a daily basis.  *See* FAC ¶¶ 39 ("ho on the floor," "Only woman allowed on this floor are those here to suck my dick," "Does the bitch got big titties," frequent use of the n-word, "gay motherfuckers," "the gays are out to turn us straight men in to sissies and queers," "them gay motherfucker should die[] so real men can get a bed.").  Plaintiff alleges that he made "several efforts" to meet with ECS's manager to discuss the "constant use of racial, sexual, and homopho[bic] comments during his posted drop-in hours but was never able to obtain a meeting," and also emailed the Direct of Programs for ECS in an attempt to facilitate a discussion, but was never provided with an opportunity to have his concerns heard.  FAC ¶¶ 40, 44, 53.  The Court finds that Plaintiff's allegations of constant slurs and harassing language coupled with ECS's failure to hear or address Plaintiff's concerns are stated enough to state a hostile housing environment claim under the FHA.  Thus, the Court **DENIES** ECS's motion to dismiss with respect to Plaintiff's FHA hostile environment claim.

Plaintiff also alleges that he made several inquiries about transferring to the disabled men's section on the first floor but was told that no beds were available, even though other residents in the disabled men's shelter said there were several empty beds.  *Id.* ¶¶ 41–42.  But Plaintiff does

1    not allege that he suffers from a cognizable handicap under the FHA, that ECS knew of his

2    disability or should have known, or that the accommodation of his handicap may have been

3    necessary to afford him an equal opportunity to use and enjoy the dwelling.  *Dubois v. Ass'n of*

4    *Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006) (citing 42 U.S.C. §

5    3604(f)(3)(B)).  Accordingly, the Court **GRANTS** ECS's motion to dismiss with respect to

6    Plaintiff's FHA reasonable accommodation claim **with leave to amend**.

7        2.    Title I of the Housing and Community Development Act of 1974

8        Next, the parties dispute whether Plaintiff has a valid claim under Title I of the Housing

9    and Community Development Act ("HCDA") of 1974.  Title I authorizes an allotted amount of

10   money for grants to general local government units for urgent community development needs.  *See*

11   42 U.S.C. § 5309.  Specifically, it "established a system of federal assistance for HUD [United

12   States Department of Housing and Urban Development] administered community development

13   activities, consolidating ten community development programs into a single block grant program."

14   *Broaden v. Harris*, 451 F. Supp. 1215, 1217 (W.D. Pa. 1978).  Title I prohibits the discrimination

15   based on race, color, national origin, disability, age, religion, and sex under any of the Community

16   Development Programs financed by the Title.  *See* 42 U.S.C. § 5309(a).  The statute allows the

17   Secretary of the HUD to notify the state governor or the chief executive officer of the local

18   government unit for any noncompliance by the "State or unit of general local government."  *Id.* §

19   5309(b).  If the governor or chief executive officers fails or refuses to secure compliance within a

20   reasonable period, the Secretary has the authority to, among other things, "refer the matter to the

21   Attorney General with a recommendation that an appropriate civil action be instituted."  *Id.* §

22   5309(b), (c).

23       Plaintiff claims that in 2019, DSCS received over $3 million in HUD community block

24   grant entitlement funds including HUD Emergency Solutions Grant Funds to provide essential

25   emergency shelter services.  FAC ¶ 11.  He also alleges that ECS received over $5 million in HUD

26   community block grant entitlement funds in 2019.  *Id.* ¶ 7.  Plaintiff's argument seems to be that

27   because he was allegedly discriminated against at facilities funded by the HCDA, all the

28   Defendants are liable for violating Title I—the City for providing the Community Development

1    Block Grant funding for the shelters that allegedly discriminated against him and DSCS and ECS

2    for operating the shelters in a discriminatory way.  ECS Opp. at 7; DSCS Opp. at 9–10; City Opp.

3    at 3.

4           However, the HCDA does not grant a private right of action because Title I "governs the

5    relationship between the federal and local governments" and therefore "it does not, even

6    implicitly, address the rights of private parties."  *See e.g.*, *Hernandez v. Pierce*, 512 F. Supp. 1154,

7    1159 (S.D.N.Y. 1981); *see Lil' Man in the Boat, Inc. v. City & Cty. of San Francisco*, 5 F.4th 952,

8    958 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 900 (2022) ("If Congress does not provide a private

9    right of action explicitly within a statute's text, [courts] must determine whether Congress implied

10   one.").  Accordingly, Plaintiff cannot bring a claim under the HCDA because there is no private

11   right of action under the HCDA.  *See Walker v. City of Lakewood*, 272 F.3d 1114, 1127 (9th Cir.

12   2001) (plaintiff may bring action under FHA instead).

13          The Court **GRANTS** the City's, DSCS's, and ECS's motions to dismiss Plaintiff's HCDA

14   claims **with prejudice**.

15               3.    Title VI of the Civil Rights Act of 1964

16          The parties also dispute whether Plaintiff has a valid claim under Title VI of the Civil

17   Rights Act of 1964, which provides: "No person in the United States shall, on the ground of race,

18   color, or national origin, be excluded from participation in, be denied the benefits of, or be

19   subjected to discrimination under any program or activity receiving Federal financial assistance."

20   42 U.S.C. § 2000(d).  Private parties may sue to enforce Title VI, but it only extends to cases of

21   intentional discrimination and not disparate impact.  *Alexander v. Sandoval*, 532 U.S. 275, 279–81

22   (2001); *see also Mackey v. Bd. Of Trustees of California State Univ.*, 31 Cal. App. 5th 640, 660

23   (2019) ("There is an implied private right of action to enforce title VI's core prohibition against

24   racial discrimination in federally funded program, to the extent the claims rest on intentional

25   discrimination, not disparate impact.").  Moreover, "[t]o state a claim for damages under 42

26   U.S.C. § 2000d, et seq., a plaintiff must allege that (1) the entity involved is engaging in racial

27   discrimination; and (2) the entity involved is receiving federal financial assistance."  *Fobbs v.

28   Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled on other grounds by*

United States District Court
Northern District of California

*Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001). In other words, Title VI claims cannot be asserted against individual defendants because they are not the ones receiving federal funding.

To show intentional discrimination, "plaintiffs must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class." *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2009). "Even without direct evidence, a plaintiff may articulate discriminatory intent through evidence of (1) discriminatory impact; (2) the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes; (3) irregularities in the passage of legislation such as departures from normal procedural sequence; and (4) legislative or administrative history such as contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522–23 (9th Cir. 2011) (internal quotation marks and alterations omitted). Moreover, intentional discrimination under Title VI may also be established through a showing of deliberate indifference. *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir.1998) (finding that school district may violate Title VI if there is a racially hostile environment, the district had notice of the problem, and it failed to respond adequately); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012) (explaining that deliberate indifference to teacher or peer harassment of individual may create liability under Title VI); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014) ("Recently, we held that plaintiffs bringing claims under the ADA and R[ehabilitation] A[ct] may establish intentional discrimination with a showing of deliberate indifference. *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013). Given the parallels between Title VI and the statutes at issue in *S.H.*, our rationale for adopting deliberate indifference as a form of intentional discrimination in *S.H.* applies with equal force in the Title VI context."); *Bryant v. Indep. Sch. Dist. No. I–38 of Garvin Cnty., Ok.*, 334 F.3d 928, 934 (10th Cir. 2003) (holding that "deliberate indifference to known instances of student-on-student racial harassment is a viable theory in a Title VI intentional discrimination suit"). To state a prima facie case of deliberate indifference

19

United States District Court
Northern District of California

under Title VI, courts borrow from the standard under Title IX.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs.  The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate").  That is, a Plaintiff must show (1) the racial harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the benefits of the federally funded program; (2) the program had actual knowledge of the harassment; and (3) the program was deliberately indifferent to the harassment.  *See, e.g.*, *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 739 (9th Cir. 2000).

B.     City

Plaintiff's theory of liability against the City is based on his assertion that the City is responsible for the alleged Title VI violations of its contractors.  But, as in Plaintiff's FHA claim against the City, Plaintiff does not cite any cases finding Title VI liability against a municipality on the basis of a duty of supervision of a subrecipient of a grant as Plaintiff asserts herein.  Thus, the Court **GRANTS** the City's motion to dismiss Plaintiff's Title VI claim **without leave to amend**.

C.     DSCS

As an initial matter, DSCS asserts that Plaintiff has not alleged that it uses the federal funds to put on their programs, and thus Title VI does not apply to it.  DSCS Mot. at 8.  But Plaintiff has alleged that DSCS receives $3 million in HUD community block grant entitlement funds, *i.e.*, federal funding, to provide essential emergency shelter services.  FAC ¶ 11; *see also* DSCS Mot. at 2–3.  Thus, as alleged, DSCS is subject to Title VI.  However, the allegations in the FAC are insufficient to support a claim under Title VI.  Plaintiff's Title VI claims fails for the same reasons why Plaintiff's FHA claim against DSCS fails.  However, as with Plaintiff's FHA claim, Plaintiff may be able to allege specific facts to state a claim under Title VI.  Thus, the Court **GRANTS** DSCS's motion to dismiss Plaintiff's Title VI claim, **with leave to amend**.

D.     ECS

For the reasons discussed with respect to Plaintiff's FHA hostile environment claim

1    against ECS, Plaintiff has alleged enough to state a claim of deliberate indifference under Title VI

2    against ECS.  Plaintiff's allegations that he was subjected to the frequent use of racial slurs by

3    other residents during his stay at the ECS shelter, notified ECS staff through multiple channels of

4    the discriminatory environment, and was denied the opportunity to be heard by any ECS staff,

5    FAC ¶¶ 39-53, are enough to state a claim that he was subjected to severe racial harassment, ECS

6    had actual knowledge of the harassment, and ECS was deliberate indifferent to the harassment.

7    *See Reese*, 208 F.3d at 739.  Thus, the Court **DENIS** ECS's motion to dismiss Plaintiff's Title VI

8    claim.

9    E.    Individual Defendants

10          As already explained, Title VI applies to entities receiving federal funds, *not* to

11   individuals.  Thus, Plaintiff's Title VI claims as to individual defendants are **DISMISSED with**

12   **prejudice**.

13   F.    State Law Claims

14          Furthermore, Plaintiff alleges four state claims against various Defendants.  Specifically,

15   he alleges a claim under the California Fair Employment & Housing Act as well as claims of

16   negligence, retaliation, and breach of mandatory duty.  Federal courts have "supplemental

17   jurisdiction over all other claims that are so related to claims in the action within such original

18   jurisdiction that they form part of the same case or controversy under Article III of the United

19   States Constitution."  28 U.S.C. § 1367(a).  Because Plaintiff's state law claims form part of the

20   same case or controversy as his federal claims, this Court has supplemental jurisdiction of the state

21   law claims.

22          1.    California Fair Employment & Housing Act

23          The parties first dispute whether Plaintiff has a valid claim under the California Fair

24   Employment & Housing Act ("FEHA"), which prohibits discrimination in housing based on

25   protected characteristics such as race, age, gender, sexual orientation, and disability.  Cal. Gov't

26   Code § 12900, et seq.  Courts apply the same standards to FHA and FEHA claims.  *See Walker v.*

27   *City of Lakewood*, 272 F.3d 1114, 1131 n.8 (9th Cir. 2001).  Therefore, for the same reasons as the

28   FHA analysis above, the Court **DENIES** ECS's motion to dismiss Plaintiff's hostile environment

United States District Court
Northern District of California

claim, but otherwise **GRANTS** the DSCS motion to dismiss the FEHA claims **with leave to amend** and the City's **motion without leave to amend.**

Both DSCS and ECS assert that Plaintiff's FEHA claim also fails because he has failed to exhaust his administrative remedies, namely filing a complaint with the California Department of Fair Employment and Housing and obtaining a notice of right to sue under California Government Code sections 12960 and 12965(b). *See* ECS Mot. at 8–9; DSCS Mot. at 8 (citing *Morgan v. Regents of Univ. of Cal.,* 88 Cal. App. 4th 52, 63 (2000)). DSCS and ECS are wrong. Section 12960 and 12965 only apply to claims of employment discrimination under the FEHA. *See* Cal. Gov't Code § 12960 (titled "Procedure for prevention and elimination of unlawful *employment* practices") (emphasis added). In contrast, California Government Code section 12989.1(b), which governs the commencement of civil actions regarding housing discrimination under FEHA, states, in part, "An aggrieved person may commence a civil action whether or not a complaint has been filed under this part and without regard to the status of any complaint." Cal. Gov't Code § 12989.1. There is no exhaustion requirement under FEHA for housing discrimination.[5] *See Alcaraz v. KMF Oakland LLC*, No. 18-CV-02801-SI, 2020 WL 3128872, at *7 (N.D. Cal. June 12, 2020).

    2.    Negligence Claim

Next, the parties dispute whether Plaintiff has a valid negligence claim. The elements of a negligence cause of action are duty, breach of duty, proximate cause, and damages. *Peredia v. HR Mobile Servs., Inc*., 25 Cal. App. 5th 680, 687 (2018). For the reasons below, Plaintiff's negligence claims against all Defendants are dismissed with leave to amend.

    a.    City

The City argues that Plaintiff's negligence claim against the City is without merit because the claim lacks the requisite statutory basis to hold a public entity liable.[6] City Mot. at 16. The

---

[5] Plaintiff appears to mistakenly cite California Government Code section 12899.1(b), which concerns the state water resources and development system, instead of section 12989.1(b). *See* DSCS Opp. at 11.

[6] The City additionally asserts that Plaintiff's negligence claim fails against Perdue. City Mot. at 17–18. It also notes that Plaintiff has failed to properly serve Perdue. *Id.* at 1 n.1. The City's

United States District Court
Northern District of California

City's argument is incorrect.  Plaintiff cites the California Tort Claims Act, FAC ¶ 25, which states recites that a public entity is not liable for an injury unless provided by statute.  Cal. Gov't Code § 815.  Section 815.2, does exactly that: it imposes liability on public entities.  *See Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal. 4th 925, 932 (1998).  It provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee...."  *Id.*  Accordingly, this section "expressly makes the doctrine of respondeat superior applicable to public employers."  *Id.* (internal citations omitted).

The question, then, is whether Plaintiff has plausibly alleged that the City is liable for the negligence of its employees for acts or omissions within the scope of their employment.  To state a claim for negligence, a plaintiff must allege the defendants owed a duty of care; defendants breached their duty; and defendants' breach caused plaintiff's injury.  *See Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013).  Plaintiff alleges the city is liable for negligence based on the actions of its independent contractors, DSCS and ECS.  As explained below, Plaintiff fails to state claims of negligence against DSCS and ECS; therefore, Plaintiff's derivative negligence claim against the City also fails.

### b.    DSCS

The elements of a negligence claim under California law are duty, breach, causation, and injury/damages.  *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017).  DSCS contends that Plaintiff's negligence claim fails because there are insufficient facts alleged in the FAC "showing any connection between any alleged breach of the duty by Dolores Street Defendants and Plaintiff's alleged injuries."  DSCS Mot. at 8–9.  DCCS argus that this is because in his FAC, Plaintiff only asserts conclusory allegations that DSCS's "negligence, hiring, training and supervisory [sic] of defendants DSCS resulted in damages to Plaintiff" and that DSCS "had a duty to protect Plaintiff and breached that duty resulting in damages."  FAC ¶¶ 91–92.

However, in Plaintiff's opposition, he points to Article XIII of the San Francisco

assertions are moot, however, because the Court has already dismissed the claims against Perdue in its order granting Plaintiff's administrative motions.  Docket No. 42.

United States District Court
Northern District of California

1   Administrative Code, entitled, "Standard of Care for City Shelters," which provides in part:

> "Each shelter shall provide client complaint forms in common areas of the shelter and shall make a complaint form available to a shelter client upon request. In addition, shelter staff must accept and investigate written client complaints from the Shelter Monitoring Committee. Shelter staff shall review and respond to written client complaints within 2 business days. Shelter staff shall make best efforts to take necessary corrective action in response to all client complaints internally within 5 days. If the client is not satisfied with the response, the shelter operator shall refer the complaint to the contract monitor and to the Shelter Monitoring Committee."

S.F. Admin. Code, § 20.405.  Plaintiff also points to section 20.404, entitled "Contract Requirements," which requires shelter operators to:

> "[(a)(1)] treat all shelter clients equally, with respect and dignity, including in the application of shelter policies . . . [(a)(2)] provide shelter services in an environment that is safe and free of physical violence . . . [(a)(8)] provide shelter services in compliance with the Americans with Disabilities Act (ADA) . . . [(a)(13)] make the shelter facility available to shelter clients for sleeping at least 8 hours per night . . . [(a)(31)(ix)] provide annual all-staff mandatory trainings [that address] cultural humility, including sensitivity training regarding homelessness, the lesbian, bisexual, gay, and transgender communities, people with visible and invisible disabilities, youth, women, and trauma victims."

S.F. Admin. Code, § 20.404.  Plaintiff claims a duty of care by DSCS, pursuant to this statute in his opposition.  DSCS Opp. at 11–12.  Plaintiff also asserts that DSCS along with Hidalgo, Lacayo, and Reus breached that duty by failing to comply with the shelter operator requirements. *Id.*  But assuming *arguendo* that the statutory provisions above implied a duty of care upon DSCS and that DSCS breached they duty through its deficient hiring, training or supervision of its employees, Plaintiff still fails to plead facts going to the fourth element of negligence: injury. *Vasilenko*, 3 Cal. 5th at 1083.   Although Plaintiff alleges that DSCS, acting through Reus and Hidalgo, improperly denied his request for transfer from Jazzie's shelter and that Plaintiff was treated less favorably than another shelter resident during a grievance hearing, FAC ¶¶ 69-70, Plaintiff does not allege how he was injured by such conduct nor what damages he sustained from such conduct.  Accordingly, the Court **GRANTS** DSCS, Hidalgo, and Reus's motion to dismiss

Plaintiff's negligence claim **with leave to amend**.[7]

### c.   ECS

Similarly, Plaintiff cites to S.F. Admin. Code, §§ 20.404, 20.405 in his opposition to ECS's motion to dismiss to imply ECS's duty of care.  ECS Opp. at 8.  For the purposes of Plaintiff's claim against ECS, the statute also requires shelter operators to "[(a)(15)] provide shelter clients with pest free storage . . . [(a)(25)] require all shelter staff to wear a badge that identifies the staff person by name and position."  S.F. Admin. Code § 20.404.  Plaintiff alleges that there were mice running around and leaving droppings in the men's bedroom area.  FAC ¶ 34. Plaintiff alleges that he filed a complaint with a Shelter employee and contacted the CCSF building inspection department, but nothing was done.  FAC ¶¶ 35, 37.  Additionally, Plaintiff alleges that shelter staff rarely wore their name tags as required.  FAC ¶ 43.  Finally, Plaintiff alleges ECS allowed a hostile environment to persist in the shelter by failing to address his concerns regarding persistent racially and sexually harassing comments by other residents.  FAC ¶¶ 40, 44, 53.

However, again, assuming *arguendo* that ECS owed Plaintiff a duty to care and breached that duty by allowing for unhealthy conditions to persist, failing to wear name tags, and failing to address the climate of harassment, Plaintiff fails to explain how he was injured by this conduct nor what damages he incurred.  Where the FAC refers to negligence specifically, Plaintiff only alleges that ECS was "negligent" in "hiring, training, and supervisory [sic] defendants Treggiari, Brown and Nmebe [sic]."  FAC ¶ 82.  Therefore, Plaintiff fails to allege facts sufficient to demonstrate injury or damages, are required to state a claim for negligence.  *Vasilenko*, 3 Cal. 5th at 1083.

Thus, the Court **GRANTS** ECS, Treggiari, Brown, and Nnebe's motion to dismiss Plaintiff's negligence claim **with leave to amend**.

### 3.   Retaliation Claim

Although Plaintiff does not articulate the statute under which he alleges retaliation, the Court construes Plaintiff's allegations of retaliation against DSCS and ECS under the Fair

---

[7] The Court previously dismissed the claims against Lacayo.  *See* Docket No. 42.

United States District Court
Northern District of California

1    Housing Act.  The Court dismisses Plaintiff's claim with leave to amend because, even assuming

2    he alleges retaliation under the Fair Housing Act, he fails to plausibly plead any retaliatory

3    conduct by Defendants.

4                    a.    DSCS

5          The Fair Housing Act prohibits coercion, intimidation, threats, or interference with the

6    exercise of rights under the federal fair housing laws.  42 U.S.C. § 3617.  To establish retaliatory

7    eviction under the FHA, the tenant must prove (1) the tenant engaged in a protected activity, (2) an

8    adverse housing consequence causally linked to that activity, and (3) resulting damage.  *San Pedro*

9    *Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998).  Once plaintiff

10   establishes her prima facie case of retaliation, defendant must proffer a legitimate, nonretaliatory

11   justification for the adverse action.  *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1264 (9th Cir.

12   1997).

13         Plaintiff fails to state a claim of retaliation against DSCS.  The only allegation of

14   retaliation regarding DSCS is that Plaintiff was allegedly "threatened with being smothered in his

15   sleep after Plaintiff contacted the SF Human Rights Committee."  FAC ¶ 73; DSCS Opp. At 6.

16   Specifically, Plaintiff alleges that after he had filed a complaint on August 9, 2019, about the

17   "sexually hostile environment and racially discriminatory treatment," Perdue emailed him about

18   the complaint on August 28, 2019.  DSCS Opp. at 13.  The following day, he received another

19   email that the complaint was turned over to Lacayo and then on or about August 30, 2019,

20   "Plaintiff was threatened with being smothered."  *Id.*  Plaintiff does not specify who he was

21   allegedly smothered by.  Plaintiff does not allege that any of the DSCS defendants made this

22   threat, nor does he allege any other retaliatory conduct by DSCS.  Therefore, assuming Plaintiff's

23   filing of a complaint satisfies the first prong of a FHA retaliation claim, Plaintiff has not alleged

24   the second two prongs: an adverse housing consequence casually linked to that activity and

25   resulting damage.  *San Pedro Hotel Co., Inc*, 159 F.3d at 477.  Therefore, Plaintiff has failed to

26   state a claim for retaliation against DSCS under the FHA.

27                   b.    ECS

28         Likewise, Plaintiff fails to state a claim of retaliation against ECS.  He alleges that his

United States District Court
Northern District of California

26

complaint "about a racially and sexually hostile environment" led to "adverse actions by staff and clients at Sanctuary, a ECS operated and managed shelter." ECS Opp. at 9. But he does not allege so in his FAC. In his opposition, Plaintiff points to the following events in support of his retaliation claim: After he wrote an email to Treggiari about the "repeated use of racial, sexual, and homophob[ic] language by staff and clients" as well as "repeated occurrences of unwanted advances by clients," he was allegedly called racial slurs and threatened with physical assault by another resident. FAC ¶¶ 44–45. He never received a meeting with shelter staff managers, Brown and Nnebe, as Treggiari told him he would. *Id.* ¶ 53. In another incident, after he called the SF police to intervene in an altercation with another resident at ECS's shelter, an ECS staff member told the police that Plaintiff could make a formal complaint and that an investigation would occur. *Id.* ¶¶ 46–50. After the police left, however, Plaintiff was given complaint forms, but shelter staff refused to accept his written complaint. *Id.* ¶ 50. And after he complained about being stalked and threatened in the stairwell, the supervisor on duty declined to help him because the shelter did "not provide private security services" and advised him to call the police. *Id.* ¶¶ 51–52. Plaintiff alleges that after he "was threatened with having his throat cut," "he left the Sanctuary shelter" and "requested Defendant Treggiari to drop his bed so he could go elsewhere." *Id.* ¶¶ 55–56.

Like Plaintiff's retaliation claim against DSCS, it is unclear from the allegations in the complaint what adverse housing consequence causally linked to Plaintiff's protected activity ECS is responsible for, nor what damage resulted. Plaintiff's opposition brief argues that the Court should draw an inference that ECS retaliated against him by declining to set up a meeting to discuss his complaints of harassment, declining to accept his written complaint, and failing to ensure his person security. Opp. at 9. But Plaintiff's argument in his briefing does not substitute for the allegations in his complaint. Plaintiff's complaint does not clearly connect his protected activity to alleged adverse housing consequences. For example, Plaintiff alleges that he "never got the meeting with shelter staff managers," but does not allege how this omission was an "adverse housing consequence" in retaliation for his protected activity. FAC ¶ 54. And Plaintiff's allegations as to threats made by third parties who were not employed by ECS, and Plaintiff's own decision to leave the shelter, *id.* ¶¶ 55–56, do not, on their own, provide facts upon which he can

United States District Court
Northern District of California

United States District Court
Northern District of California

1   maintain a retaliation claim against ECS.  Moreover, even if the Court were to assume the

2   connection between protected activity and the alleged adverse housing consequences that Plaintiff

3   argues in his opposition brief, Plaintiff has not provided any allegations of resulting damages, as

4   required to state a claim for retaliation under the FHA.  *See San Pedro Hotel Co., Inc*, 159 F.3d at

5   477.  Plaintiff may be able to cure these deficiencies through amendment.

6         Accordingly, the Court **GRANTS** dismissal of Plaintiff's retaliation claims against ECS

7   and DSCS **with leave to amend**.

8         4.     <u>Breach of Mandatory Duty</u>

9         Finally, the City disputes whether Plaintiff has a valid claim for breach of mandatory duty.

10   California Government Code section 815.6 provides as follows:

> "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

15   Cal. Gov't Code § 815.6.  There is a three-pronged test for determining whether liability may be

16   imposed on a public entity pursuant to Section 815.6: (1) the enactment must impose a mandatory

17   and not a discretionary duty; (2) the enactment must intend to protect against the kind of risk of

18   injury suffered by the party asserting section 815.6 liability; and (3) breach of the mandatory duty

19   must be a proximate cause of the injury suffered.  *MacDonald v. State of California*, 230 Cal.

20   App. 3d 319, 327 (1991).  "Enactment" includes a constitutional provision, statute, charter

21   provision, ordinance, or regulation.  Cal. Gov't Code § 810.6.  And "regulation" is defined as "a

22   rule, regulation, order or standard, having the force of law, adopted by an employee or agency of

23   the United States pursuant to the federal Administrative Procedure Act . . ."  Cal. Gov't Code §

24   811.6.

25         Plaintiff alleges that the City "failed to protect Plaintiff from cigarette smoke at the Glide

26   meals line, in violation of a San Francisco City Ordinance and failed to prevent retaliation for

27   protected activity as it related to access to homeless shelter services, meals, and other social

28   services."  City Mot. at 15 (citing FAC ¶¶ 59, 104).  Plaintiff does not specify which San

Francisco Ordinance it seeks to invoke and therefore the Court cannot determine whether the Ordinance imposes a mandatory duty upon the City or whether the alleged breach was a proximate cause of Plaintiff's injuries.  *Id.* at 16.  As a result, the Court **GRANTS** dismissal of Plaintiff's breach of mandatory duty claim **with leave to amend.**

## V.     CONCLUSION

For the reasons above, the Court **DENIES** ECS's motion to dismiss Plaintiff's hostile environment claims under the FHA, CA FEHA, and Title VI.

The Court **GRANTS** Defendants' motions to dismiss all remaining claims.

The Court **DISMISSES** the following claims **with leave to amend**: the FHA reasonable accommodation claim against ECS, the FHA, CA FEHA and Title VI claims against DSCS, the negligence claims against all Defendants, the retaliation claims against ECS and DSCS, and the breach of mandatory claim against the City.

The Court **DISMISSES** the following claims **with prejudice:** the Title I claim against all Defendants, the FHA, CA FEHA and Title VI claim against the City, and the Title VI claim against individual defendants.

Plaintiff may file a second amended complaint by **June 17, 2022**.

This order disposes of Docket No. 37, 38 and 50.

**IT IS SO ORDERED**.

Dated: May 17, 2022

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

29